**CITY OF VERNON, CALIFORNIA, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Southern California Edison Company, Cities of Anaheim, Riverside, et al., Intervenors.**

No. 87–1255.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 26, 1988.

Decided April 26, 1988.

---

Arnold Fieldman, with whom Channing D. Strother, Jr., Washington, D.C., was on the brief, for petitioner.

Joanne Leveque, Atty., F.E.R.C., with whom Catherine C. Cook, General Counsel, and Jerome M. Feit, Solicitor, F.E.R.C., Washington, D.C., were on the brief, for respondent.

Sandra J. Strebel, with whom Bonnie S. Blair and George H. Williams, Jr., Washington, D.C., were on the brief, for intervenors Cities of Anaheim, et al.

Paul G. Bower, Los Angeles, Cal., with whom Richard M. Merriman, Brian J. McManus, Washington, D.C., and Helen I. Bendix, Los Angeles, Cal., were on the brief, for intervenor Southern California Edison Co. Richard K. Durant and Frank J. Cooley, Rosemead, Cal., also entered appearances for intervenor Southern California Edison Co.

Before WALD, Chief Judge, SILBERMAN and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Dissenting Opinion filed by Circuit Judge WILLIAMS.

SILBERMAN, Circuit Judge:

The city of Vernon, California is a wholesale customer of Southern California Edison Company. Vernon has asked the Federal Energy Regulatory Commission to require Edison to sell Vernon "interruptible electric power service" so Vernon may pass the service on to its retail customers in much the same manner that Edison now provides interruptible service to its own direct retail customers. FERC declined to order the proposed service, holding that Vernon failed to make a prima facie case that Edison's behavior was anticompetitive or unduly discriminatory. But FERC failed to give any indication of what showing was necessary—or sufficient—to make a prima facie case. We accordingly grant the petition for review and remand to FERC for a fuller exposition of its reasoning.

I.

Southern California Edison supplies electric power to both retail and wholesale customers. Its wholesale rates are regulated by FERC; its retail rates by the California Public Utilities Commission. Edison offers an interruptible service to its retail industrial and commercial customers who have relatively large demands for power. A customer electing that service is able to reduce its power costs in exchange for bearing some risk it will be called upon to cut its consumption if overall power use approaches Edison's capacity. The customer designates a "firm" level of service, and Edison can request on ten or thirty minutes notice that the customer reduce its electricity use to that firm level. In return, the customer receives a discount—in the form of a credit against its demand charge—for the use of power, when available, above its firm service level.

The advantages to the customer are plain and, the record before us suggests, are enhanced by the infrequency of calls for interruption by Edison. Edison benefits primarily in the long run; Edison can, during periods of peak demand, reduce interruptible customers to their firm levels, which in turn allows Edison to reduce the capacity of generation facilities it must maintain or construct to meet peak demand. *See Fort Pierce Utils. Auth. v. FERC,* 730 F.2d 778, 786 (D.C.Cir.1984).

The city of Vernon buys electricity wholesale from Edison and resells it to a variety of residential, commercial, and industrial customers. Vernon states that several of its industrial customers, who would be able to purchase interruptible power from Edison were they its direct retail customers, have asked Vernon to provide them an equivalent interruptible service. Vernon consequently asked Edison to sell it interruptible power at wholesale and, at a hearing before an Administrative Law Judge on the reasonableness of a rate increase filed by Edison, asked FERC to require Edison to provide such a service.

Vernon's chief witness in the hearing testified that Edison could provide wholesale customers such as Vernon interruptible power under virtually the same rate schedule used for retail sales of interruptible power, if the schedule were revised to "mak[e] the City the customer of Edison, requir[e] the City to have a contract with the [retail] customer for interruptible service, provid[e] the procedure for requiring the customer to have suitable communications equipment, and a procedure under which Edison can notify the City to interrupt the customer." Joint Appendix at 55. The witness had edited an Edison schedule in such a manner, and it was put in evidence. On cross-examination, the witness further testified that demand charges, the monitoring and enforcement of interruptions, and the criteria for interruption would all be identical under the proposed system to Edison's existing interruptible service operations.

Vernon also submitted a handwritten memorandum, obtained from Edison through a discovery request, apparently of a meeting between representatives of Edison and Bethlehem Steel, one of Vernon's largest customers. The memorandum indicates Bethlehem Steel could save $74,000 a month by using Edison's interruptible service schedule and states that Bethlehem suggested alternatives to its existing con-

tract with Vernon: FERC could order Edison to make interruptible service available to Vernon for resale, or Bethlehem could receive service directly from Edison. On the basis of this evidence, Vernon argued to the ALJ that Edison discriminated against Vernon, in violation of section 205(b) of the Federal Power Act, 16 U.S.C. § 824d(b) (1982), by refusing to make available to it the same interruptible service offered retail customers, and that it did so to maintain an anticompetitive advantage in the retail market. In support of this contention, Vernon suggested an analogy between its situation and the "price squeeze" cases, which established FERC's authority to remedy price discrimination by utility companies between their wholesale and retail customers. *See* Joint Appendix at 8 (argument to ALJ); *see also* Vernon's Initial Brief before the ALJ (relying on *Federal Power Commission v. Conway Corp.*, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed. 2d 626 (1976), the first case applying the price squeeze theory to utilities).

Edison's chief witness responded that Vernon was already in position to offer its customers interruptible power by selecting its own firm figure, above which it would not draw power from Edison, and interrupting its customers when total use reached that level. Edison also argued that there were several unspecified "extremely difficult technical issues" that would have to be resolved before the proposed service would be possible.

The ALJ's Initial Decision, *Southern Cal. Edison Co.*, 26 F.E.R.C. (CCH) ¶ 63,098 (1984), concluded interruptible service could be provided to the wholesale class "with very little hardship to Edison despite the rather vague allusions to technical difficulties made by [Edison]." *Id.* at 65,360. The ALJ expressly declined to reach the allegations of discrimination and anticompetitive behavior, opining that "[t]he reasonableness of Vernon's proposal is so apparent that a decision in its favor is possible on this basis alone." *Id.* He accordingly ordered that interruptible service be offered to the wholesale class of customers.

Edison took exception to the ALJ's ruling, and the full Commission reversed. The Commission first acknowledged it was under an obligation, imposed by *Federal Power Commission v. Conway Corp.*, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976), "to consider allegations of undue discrimination and anti-competitive behavior involving retail vis-a-vis wholesale rates." [1] *Southern Cal. Edison Co.*, 38 F.E.R.C. ¶ 61,040 at 61,112 & n. 76 (1987). The Commission said, however, it could not, as the ALJ had, proceed solely on the basis that a proposal for service was reasonable. 38 F.E.R.C. at 61,113. The Commission passed over the question of its power under the Federal Power Act to order provision of the particular service requested. Instead, it held Vernon had "not sustained its burden of going forward with evidence to show that the failure of the utility to provide the requested service is unduly discriminatory or preferential." *Id.* The Commission's opinion sets forth a two-part test for discriminatory treatment where different rates or services are offered, requiring a showing that the unequally treated customers are "similarly situated," and

---

1. The statutory bases for this role are found in §§ 205 and 206 of the Federal Power Act, 16 U.S.C. §§ 824d, 824e (1982). Section 205(b) provides:

> No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

Section 206(a) states:

> Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affected [sic] such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

that the service sought is the "same service" actually offered elsewhere. *Id.*[2] FERC's application of that standard to Vernon's claim consisted of its observation that Vernon's receipt of both interruptible and non-interruptible services "may" constitute a difference in service and the statement there was a "lack of evidence ... concerning, among other things, any similarities between the retail and wholesale customers, the possible load flows on the system ..., and the effect of interruptible rates on the collection of capacity charges." On that basis, the Commission held Vernon had failed to make out a case of discrimination. *Id.*

In its application for rehearing, Vernon argued that while "Edison's retail and resale customers are certainly not similarly situated in all respects and for all purposes," Vernon had shown it was "similarly situated [to retail customers] to the extent applicable to the instant issue." Vernon also stated that the "physical implementation" of the service it proposed would be the "same" as that of the interruptible service Edison provided its retail customers. Vernon further objected that the questions about the operation of the proposed system raised by the Commission were all contentions put forward by Edison for the first time before the Commission and not aired before the ALJ. Because of the Commission's alleged reliance on issues not presented to the ALJ, Vernon complained it had been deprived of "any meaningful opportunity ... to meet [the objections] head-on when the record was being compiled." Furthermore, Vernon argued, the Commission's equivocation over the extent to which it relied on the various matters raised by Edison meant "[t]he breadth

of the Commission's true rationale ... is not discernible."

The Commission denied rehearing, replying that the non-record objections Vernon claimed it was forced to meet were simply unsatisfied elements of a "prima facie case."[3] It stated the "mere allegation of anticompetitive behavior" was not sufficient to establish such a prima facie case. 39 F.E.R.C. ¶ 61,046 at 61,142 (1987). Vernon petitioned this court for review.

## II.

Vernon argues that its evidence does constitute a prima facie case of undue discrimination, and that its prima facie case was not rebutted by Edison's meager response. We do not reach those issues, however, for FERC has given us virtually no guidance on the elements of a prima facie case. To be sure, FERC has stated that a charge of discrimination must be supported by evidence that the complainant's situation is similar to that of one who currently enjoys the same service requested, but it has given no content to the terms "similarly situated" and "same service." The basis upon which an agency action is grounded

> must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, "We must know what a decision means before the duty becomes ours to say whether it is right or wrong."

*SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)

**2.** FERC has typically relied on factors like these in defining a prima facie case of undue discrimination. *See, e.g., Southern Cal. Edison Co.,* 59 F.P.C. 2167, 2185–86 (1977); *Indiana & Mich. Elec. Co.,* 59 F.P.C. 1383, 1423 (1977); *see also ANR Pipeline Co. v. FERC,* 771 F.2d 507, 519 (D.C.Cir.1985) (per curiam).

**3.** The Commission used "prima facie case," as opposed to "burden of going forward with evidence," for the first time in the denial of rehearing. The extent to which these concepts are coterminous, and thus the significance of the

shift in nomenclature, is unclear because "unlike the ordinary situation where a party who establishes a *prima facie* case is, as a matter of law, entitled to relief unless the defending party rebuts the case, the establishment of a *prima facie* price squeeze case means only that enough has been shown to warrant inquiry." *Illinois Cities of Bethany v. FERC,* 670 F.2d 187, 195 (D.C.Cir.1981) (modified on reh'g). The Commission did not indicate which variety of prima facie case was not made.

(quoting *United States v. Chicago, M., St. P. & P. R.R.*, 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935)).

It may be that, in other circumstances, "similarly situated" and "same service" would be sufficiently self-explanatory so that no further gloss on the requirements for a prima facie case would be necessary. This area of the law is complicated, however, by the price squeeze doctrine approved in *Federal Power Commission v. Conway Corp. Conway* involved a charge that an Arkansas utility company—which sold power at wholesale, where its rates were subject to the Federal Power Commission's ("FPC") regulation, and at retail, outside the FPC's jurisdiction—was unfairly charging its wholesale customers an inflated rate in order to prevent their effective competition for retail business. The FPC refused to consider the claim of anticompetitive behavior, reasoning that it had no authority over retail rates. 426 U.S. at 275, 96 S.Ct. at 2002. The Supreme Court affirmed this court's rejection of that logic, holding that, although the FPC had power to set only wholesale rates, its obligation under sections 205(b) and 206(a) of the Federal Power Act to prevent the maintenance of "any unreasonable difference in rates, charges, service, facilities, or in any other respect," 16 U.S.C. § 824d(b), included the power to consider the relationship between jurisdictional and nonjurisdictional rate structures. *Id.* at 277–82, 96 S.Ct. at 2003–06.

*Conway* does not suggest that Vernon is necessarily entitled to the relief it seeks. But *Conway* does establish that FERC's "obligation to eliminate unreasonable discriminations," *id.* at 278, 96 S.Ct. at 2004, extends to unreasonable treatment of wholesalers that could impair their ability to compete for retail customers. It follows, we think, that "similarly situated" and "same service" are not self-defining. The Court in *Conway* observed that a wholesale rate that was reasonable when

viewed in isolation might still be deemed anticompetitive when placed in the context of competing retail rates. *Id.* at 278–79, 96 S.Ct. at 2004. It seems equally possible that a customer or service appearing at first blush not to be "similarly situated" or the "same," respectively, might meet those criteria when analysis is properly focused to take account of the necessity of comparing wholesale and retail services. In short, under *Conway*, "same service" and "similarly situated" cannot spell a requirement that a requested service be identical in *all* respects to an existing service.[4]

▮▮▮ Whether Vernon preserved this *Conway*-type argument is, however, a close question, as Judge Williams' dissenting opinion makes clear. Vernon's counsel did draw an analogy to *Conway* in oral argument before the ALJ, and Vernon's papers have consistently cited the case, albeit for the general proposition that FERC had authority to remedy inter-jurisdictional discrimination. But Vernon never said with clarity what impact *Conway* has or should have on the terms "similarly situated" and "same service." We may not consider an objection to an order of the Commission unless that objection is urged in the application for rehearing, 16 U.S.C. § 825*l*, and the Commission cannot be asked to make silk purse responses to sow's ear arguments, *see Building & Constr. Trades Dep't v. Brock*, 838 F.2d 1258, 1271–72 (D.C.Cir.1988). On balance, though, we believe the passages from Vernon's application for rehearing that we quote in Section I of this opinion sufficed—barely—to present the issue. Vernon's contention that it is situated similarly to Edison's retail customers "to the extent applicable" calls on the Commission to explain why particular distinctions are relevant. And FERC's response—its use of the notion of a prima facie case, without any explanation of the content of that concept—is completely incoherent.

---

**4.** Of course, this proposition would be true, even in the absence of *Conway*, in the obvious sense that extraneous differences in, for instance, the locations or sizes of operations would be irrelevant to a discrimination inquiry.

The impact of *Conway* is to make it clear that the bare fact of being a wholesaler rather than a retailer, and the nonsubstantive differences that attach to that difference in status, can in some instances be "distinctions without a difference."

 Thus, while we might well have approved even a relatively unformed response by FERC to Vernon's own sketchy argument (probably anything approaching our dissenting colleague's thoughtful analysis), we cannot sanction an unexplained assertion that no prima facie case has been made. It is as if the agency in response to Vernon's claim had said "We reject it because it is Tuesday rather than Wednesday." No matter how rudimentary a claim, an agency is not entitled under the APA to respond with a non sequitur. *See Puerto Rico Maritime Shipping Auth. v. Federal Maritime Comm'n*, 678 F.2d 327, 336 (D.C.Cir.) ("[T]he court's review must not merely rubberstamp the agency's decision. The agency must make clear the 'basic data and the whys and wherefores' of its conclusions." (quoting *Government of Guam v. Federal Maritime Comm'n*, 329 F.2d 251, 255 (D.C.Cir.1964))), *cert. denied*, 459 U.S. 906, 103 S.Ct. 210, 74 L.Ed. 2d 167 (1982); *Columbia Gas Transmission Corp. v. FERC*, 628 F.2d 578, 593 (D.C.Cir.1979); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C.Cir. 1970) (a court will uphold findings of "less than ideal clarity," but "must not be left to guess as to the agency's findings or reasons"), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). When FERC chooses to rely on the mechanism of a prima facie case, it must have a theory of what a prima facie case *is* before it rejects claims for failure to meet that standard. It may not, as it has here, use the traditional legal phrase merely as a shadowy *deus ex machina*. FERC must say what elements are necessary *and sufficient* to make a prima facie case, instead of merely noting the absence of particular elements that may or may not be part of a prima facie case. Otherwise we must "guess at the theory underlying the agency's action." *Chenery*, 332 U.S. at 197, 67 S.Ct. at 1577.

At oral argument, counsel for FERC was understandably unable to describe a showing that would meet FERC's standard, although she indicated that FERC would be willing to entertain a discrimination claim such as Vernon's if the party adduced *enough* evidence to satisfy FERC there was a serious issue of discrimination. This "know-it-when-we-see-it" approach, however, does not provide a reasoned explanation of an agency decision.[5] Here, for instance, FERC relied on a lack of evidence regarding, "among other things ... possible load flows on the system ... and the effect of interruptible rates on the collection of capacity charges." 38 F.E.R.C. at 61,113. But FERC did not indicate that evidence on load flows and capacity charges is a necessary component of a prima facie case, much less explain the relevance of those items. Nor did it describe the place of the "other things" in a prima facie case. We are thus left without any factual or legal basis on which to review FERC's decision. *See Columbia Gas*, 628 F.2d at 593. FERC has ample latitude, within the constraints of due process, to establish "procedures for presenting and rebutting a *prima facie* case," *Cities of Batavia v. FERC*, 672 F.2d 64, 88 (D.C.Cir. 1982), but if it requires the establishment of a prima facie case, it must explain the threshold it has set.[6]

---

5. The instant case is in this sense akin to *Delmarva Power & Light Co. v. FERC*, 770 F.2d 1131 (D.C.Cir.1985). There, we said the imposition by an ALJ of an impossible burden of proof amounted to a per se rule against "selective annualization." Because FERC had stated it had no such per se rule, we held the imposition of the burden of proof to be a departure from Commission precedent without an adequate and reasoned explanation, and we vacated and remanded for such an explanation. Here, the burden of proof is completely undefined, so that each ruling could constitute a fresh departure from prior cases.

6. FERC itself has, in dealing with the correlative concern of fairness to parties such as Vernon, acknowledged the importance of an explanation of the rationale it is applying: "[W]e do not believe it to be fair or consistent with fundamental due process to find in favor of one party or another because an adversary has failed to make a showing it was not aware would be required of it." *Cities of Batavia*, 672 F.2d at 67 (quoting FERC Opinion No. 63–A in that matter) (FERC refusing to hold for a party that made a prima facie price squeeze case, but allowing other party additional opportunity to submit response, in light of reformulation of price squeeze analysis). Indeed, after *Conway*, FERC instituted a rulemaking which resulted in guide-

By requiring an explanation of FERC, we do not suggest there could not be a number of very good reasons, either legal or technical, for which FERC might reject Vernon's attempts to create and rely on a special variation of the price squeeze. If there are reasons of law that such a claim could never succeed, FERC should simply state them, explaining how *Conway* is distinguishable, rather than relying on ad hoc criticism of each individual proposal in the guise of measuring a party's prima facie case. If, on the other hand, a claim such as Vernon's can succeed, as FERC's opinion, 38 F.E.R.C. at 61,112, and FERC's counsel's oral argument suggest, FERC's approach to resolving such a claim may not be standardless. FERC has committed essentially the error with which it charges Vernon; it has failed to provide us with adequate reasoning to support its decision. We therefore grant the petition for review and remand to FERC so that it may provide a reasoned explanation of its resolution of this case.

*It is so Ordered.*

WILLIAMS, Circuit Judge, dissenting:

In *Federal Power Commission v. Conway Corp.*, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976), the Supreme Court established the "price squeeze" doctrine. It held that the Commission's duty to set non-discriminatory rates for wholesale interstate power sales, under §§ 205(b) and 206(a) of the Federal Power Act, 16 U.S.C. §§ 824d(b) and 824e(a) (1982), required it to consider possible discrimination, by a company subject to its jurisdiction, between those rates—which are subject to Commission jurisdiction under the Act—and the company's retail sales, even though the latter are "non-jurisdictional." It reasoned that where the wholesale seller and buyer were in competition with each other for retail sales, prices discriminating against the wholesale buyers could subject them to a price squeeze, *i.e.*, unfairly disable them

from effective competition with their supplier. Further, since the Commission could not directly reach the wholesaler's retail sales, it was to remedy the discrimination by reducing the firm's wholesale rates to some level "in the lower range of the zone of reasonableness." *Id.* at 279, 96 S.Ct. at 2004 (internal quotations omitted). Thus, since *Conway* we know that the Commission may not dismiss a discrimination claim simply because the party asserting it identifies only a disparity between jurisdictional and non-jurisdictional rates or service.

Here the City of Vernon, a power retailer that buys at wholesale from Southern California Edison, makes a claim that, to succeed, must carry *Conway* well beyond its origins. Edison provides interruptible service to some of its large industrial and commercial retail customers. This service, though at rates well below its firm service, is very nearly firm. Presumably because of the beneficent operation of the law of large numbers (*i.e.*, the proposition that one may reduce risk by holding a portfolio of at least partly independent risks—the reason mortality tables are quite reliable for a million people but almost worthless for one), Edison rarely needs to cut short service to its interruptible customers.

Vernon has a potential claim under *Conway* that Edison discriminates against it by failing to provide it with interruptible service. If it had made such a claim, and the Commission had responded simply by noting that Edison only offered the interruptible service to non-jurisdictional customers, *Conway* would automatically require remand for further explanation. But that is not the claim Vernon makes. What it seeks is a service not hitherto offered by Edison to *any* customer, jurisdictional or non-jurisdictional. For clarity's sake, we may best call it "pass-through" service. It would enable Vernon to pass through to its own customers the interruptible rates and service that Edison is able to provide by

---

lines for the establishment of a prima facie price squeeze case. *See Cities of Batavia*, 672 F.2d at 86. (We are not, of course, requiring FERC to establish the elements of a prima facie case by rulemaking. *See NLRB v. Bell Aero-*

space Co., 416 U.S. 267, 290–95, 94 S.Ct. 1757, 1769–72, 40 L.Ed.2d 134 (1974) (the choice between rulemaking and adjudication lies in the first instance within the agency's discretion)).

virtue of its customer profile. This would, obviously, enhance Vernon's capacity to compete with Edison for large industrial and commercial customers.

That this claim takes us well beyond *Conway* seems clear. It is hard to tell how far, as Vernon has *never* stated the principle on which it relies. The closest anyone has come to stating a theory, so far as I can discern, is a suggestion by counsel for intervenors at oral argument. The theory appeared to be that when a wholesaler enjoys some important business advantage it is its duty to share that with competing retailers to whom it sells, so long as doing so will not involve drastic additional costs.

As Vernon has never presented this theory to the Commission, it is certainly not for us to assess whether it is compelled by the non-discrimination provisions of the Federal Power Act. (For an effort to assess a comparable proposition in the antitrust context, see Travers, Does a Monopolist Have a Duty to Deal With Its Rivals? Some Thoughts on the *Aspen Skiing* Case, 57 Colo.L.Rev. 727 (1986)). Some general questions do come to mind. I mention them only to suggest how far this takes us beyond *Conway.*

First, at what point does this principle stop? For example, suppose a wholesaler has transmission lines to an end-user and a nearby retailer does not. Does the principle require the wholesaler to share the line with the retailer? If not, why not? May this be combined with a pass-through of interruptible service of the kind sought here? Need the retailer provide anything other than billing services? Indeed, may not the principle cover them?

Second, is the competition promoted by such a policy rather synthetic? If the retailer is essentially getting everything from the wholesaler, and operating really as no more than a billing agency, will it actually be able to compete in an economic sense? Will it in reality secure customers through political advantages over the wholesaler? Will the regulatory system flow through to it the true costs of the service? After all, along with the wholesaler's economies may well come some diseconomies.

The Commission of course did not at all address such questions—for the good reason that no one presented them. If Vernon had presented a theory, the Commission would have a duty to analyse its merits and establish some sort of policy. On that we all agree. I further agree with the court that, as Judge Silberman nicely puts it, "the Commission cannot be asked to make silk purse responses to sow's ear arguments." Maj. at 1047. I part company only on the application of that principle. Vernon, in my judgment, either didn't understand the nature of its claim and therefore misstated it, or understood it well but sought to sneak its difficult aspects past the Commission.

So far as I can determine, Vernon consistently argued that all it was asking was "the same" treatment as retail interruptible customers—thereby evading the reality that what it asked was unique and depended on a far-reaching and evidently novel principle. Thus, in Vernon's Application for Rehearing, it states that its

> proposal was so structured that Edison would have *precisely the same* rights and responsibilities vis-a-vis Vernon in performing the proposed service as Edison experiences in connection with equivalent service to its own industrial customers.

*See* J.A. 151 (emphasis added). And later it said that

> there is no substantive distinction *whatever* in the one instance in which the industrial entity is an Edison customer directly and the other instances in which billing is through Vernon but the physical implementation of the interruptible rate schedule methodology is the same.

*Id.* (emphasis added).

It is true that Vernon cited *Conway* in its initial brief before the Administrative Law Judge, J.A. 67, but simply for the proposition that a regulatory commission may entertain (and remedy) a discrimination claim where the parties compared are jurisdictional and non-jurisdictional purchasers. This, of course, isn't the half of what is necessary for Vernon to succeed. On the page before Vernon makes its ap-

proach clear—and with it the simplistic (or disingenuous) character of that approach. The city pulled it all together with the observation that:

> The position of Vernon, as expressed at the hearing, is that Edison discriminates against resale customers when it refuses to make the *same* interruptible service available to them that is available to retail customers.

J.A. 66 (emphasis added). *See also* Brief of City of Vernon Opposing Exceptions, J.A. 110 (same). (Intervenors City of Anaheim, *et al.*, at least raised the analogy to price squeeze in their brief to this court, *see* Petitioner/Intervenor Brief at 9, but had not participated in the interruptible-rate dispute before the Commission.) Thus Vernon pretended that it sought relief from plain vanilla discrimination, while in fact its underlying theory was hot fudge strawberry banana swirl with sprinkles.

Given the elusive nature of Vernon's claim, it is hardly surprising that the Commission's response missed the subtleties. On one hand, it did directly answer Vernon's *purported* claim. To the central thesis that Vernon was asking only to be treated as Edison treated some of its retail customers, the Commission replied, rather mildly, "[I]t is not apparent that the service requested is the same service that is being offered at the retail level." J.A. 140. That of course was a tremendous understatement.

The Commission obviously also sensed that Vernon was asserting some complex spin on *Conway.* But with no help from Vernon as to just how the theory ran, it failed to tackle the theory head on. Indeed, it groped around, plucked a phrase from the bright lexicon of administratese ("prima facie case"), and got on with its other work. Under the sow's ear/silk purse principle, I think we should ask no more.

When a party blunders in with a half- (or quarter-) baked theory, we cannot reasonably expect the Commission to sift the claim, search out and articulate some intelligible principle, and then develop an intellectually satisfying policy response. The Commission is not some Socratic teacher, struggling to tease brilliance out of the Thrasymachi who turn up in its corridors. When applicants for relief disclaim novelty, the Commission should be free to take them at their word. If the applicant's request does not fit the category into which it has been shoehorned, the Commission should be free to show the applicant to the door without much ado, and get on with more pressing claims.

Of course this son of *Conway* was bound to arrive on the Commission's doorstep sooner or later. The risk from the court's present opinion is that, with the claim as ill-presented as it has been here, the Commission is less likely to handle it adroitly. Even now, however, the Commission can at least *ask* for more sophisticated briefing than the parties have yet offered. And it may enlist the skills of its Office of Regulatory Analysis. Even in these unpromising circumstances it may yet, with luck, arrive at a satisfactory approach.