R. Grant **SINGLETON**, Appellant,

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee**

**Cagal Cellular Communications Corporation, Intervenor.**

No. 91–1076.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 12, 1991.

Decided Jan. 17, 1992.

Michael Deuel Sullivan, with whom L. Andrew Tollin and Richard A. Hindman were on the brief, for appellant.

Sue Ann Kanter, Counsel, Federal Communications Com'n with whom Robert L. Pettit, General Counsel, and Daniel M. Armstrong, Associate General Counsel, were on the brief, for appellee.

John Q. Hearne, with whom Eliot J. Greenwald and R. Michael Senkowski were on the brief, for intervenor.

Before: BUCKLEY, WILLIAMS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge.

The Federal Communications Commission licenses companies to provide cellular

telephone service for people within an area known as a Metropolitan Statistical Area ("MSA"). Because the signal emitted by a single transmitter covers only a portion of the area, a licensee must build a number of transmitters to serve different "cells" of the MSA, each transmitter to be located at a "cell site". The FCC is concerned with each transmitter's "39 dBu contour"—defining the area in which its signal is strong and consistent enough to be usable. It requires a company providing cellular service to construct enough transmitters (and strong enough ones) that the 39 dBu contours of their signals will encompass at least 75% of the applicant's Cellular Geographic Service Area ("CGSA"), which in turn must cover at least 75% of the MSA or enough of the MSA that 75% of its population is served. See 47 CFR § 22.903 (1990).

Since 1984 the FCC has used a lottery to distribute licenses for cellular telephone service. See 47 U.S.C. § 309(i) (1991). Its rules divide the procedure for reviewing applications into three phases.[1]

At Phase 1, before the lottery, the FCC rejects applications that are not "initially acceptable for filing". Applications are deemed acceptable at this phase if they meet certain formal requirements regarding the number of copies and the contents of the cover of the application, and if they include a certification that the application is complete. The FCC calls this standard a "letter perfect" one, meaning that any applications failing to satisfy these requirements are rejected without opportunity to amend. See 47 CFR §§ 22.913(b), (c); *Cellular Lottery Rules (Further Reconsideration)*, 59 Rad.Reg.2d (P & F) 407, 410 & n. 16 (1985). The purpose of this combination of severity with superficiality is to limit the amount of staff time spent reviewing lottery applications (only a very few of which are likely ever to advance beyond the lottery), while obtaining some assurance that any tentative lottery winner will have a high probability of satisfying the ultimate substantive standards. *Id.*

At Phase 2, after the lottery, the FCC examines the winning application to ensure its completeness and compliance with cellular application standards. See 47 CFR § 22.20. This is a more substantive variation of "acceptability for filing", but is still not a final determination. See 47 CFR § 22.26(b); *REM Communication*, 3 FCC Rcd 3705, 3705 ¶ 7 (1988). If the application does not meet these standards, it is rejected, and the second place application is considered in its stead. See, e.g., *Queen City Cellular Communications*, 5 FCC Rcd 509 (1990).

At Phase 3 the applicant, now known by public notice as the "tentative selectee", may file "minor" amendments to its proposal, see 47 CFR §§ 22.23(c), 22.918(b), and challengers may file petitions to deny the application, 59 Rad.Reg.2d (P & F) at 410 & n. 17. The FCC (through the Mobile Services Division of its Common Carrier Bureau) considers the application, amendments, and petitions to deny, and either grants the application without a hearing or orders a hearing on the application. See 47 U.S.C. §§ 309(d)–(e); 47 CFR § 22.32.

\*     \*     \*     \*     \*     \*

When the Commission called for applications for a license for the Santa Rosa–Petaluma, California MSA, the 600–plus applicants included R. Grant Singleton, the petitioner here, and Cagal Cellular Communications Corporation, the intervenor. As the Commission found the applications of both "initially acceptable for filing", both survived the pre-lottery phase. Cagal won the lottery; Singleton placed second. Cagal survived Phase 2 scrutiny, and Singleton and two other applicants filed petitions to deny its application. In July 1987, the Common Carrier Bureau rejected the petitions to deny and granted Cagal's application. *Cagal Cellular Communications Corp.*, 2 FCC Rcd 4270 (1987) ("*Bureau Decision*"). About three and a half years later, the Commission denied Singleton's application for review, 6 FCC Rcd 285 (1991) ("*Commission Decision*"), and he appeals under 47 U.S.C. § 402(b).

---

1. The events underlying this litigation took place during Round V of the cellular licensing process. Rounds I through IV involved the distribution of licenses for the top 120 markets.

Singleton makes three arguments. First, he makes a procedural claim that the Commission determined that the Cagal application satisfied the Phase 2 standards for acceptability for filing only *after* granting the application. Second, he argues that the Commission could not properly have found that application acceptable for filing at Phase 2. Third, he says that the FCC should have ordered a hearing on the Cagal application.

\* \* \* \* \* \*

Section 309(i) of the Communications Act provides that the Commission has authority to issue licenses by means of a lottery only "after" a determination that the application was "acceptable for filing".[2] Singleton objects that the Commission made no such finding before the grant of the license in 1987. Though acknowledging that on review the Commission made such a finding (in 1991) (erroneously, he says—his second argument), he denies that the Bureau's decision comprised such a finding. He notes that the Commission has said that the lottery winner's application will be subject at Phase 2 to "strict scrutiny to ensure full compliance", see 59 Rad.Reg.2d (P & F) at 410, and characterizes the Bureau's rather conclusory treatment of the issue, *Bureau Decision*, 2 FCC Rcd at 4270–71, as clearly not amounting to strict scrutiny.

█ But the Bureau's decision unquestionably represented a "finding" that Cagal's application was acceptable for filing. It rejected Singleton's claim that various defects rendered the application "defective", *Bureau Decision*, 2 FCC Rcd at 4271, and in context there can be no doubt that this addressed Phase 2 acceptability.

█ The remainder of Singleton's procedural claim—his attack on the conclusory character of the Bureau's stated analysis—rests mainly on the language quoted above referring to Phase 2 review as "strict scrutiny", a reference that also underlies his substantive attack on the Phase 2 approval. When examined in context, however, the phrase turns out to supply neither a procedural nor a substantive standard. The Commission used it in announcing an interpretive rule that relaxed the Phase 1 review of applications—review that, in light of "geometric increase in the number of applications in each round thus far", *Cellular Lottery Rules (Further Reconsideration)*, 59 Rad.Reg.2d (P & F) 407, 410 (1985), had in the previous round led to a delay of over one year between the filing deadline and the first acceptance of applications, *id.* at 409 & n. 10. The bulk of the relevant part of the discussion deals with the pros and cons of relaxing Phase 1 review. After concluding that the pros prevail, the Commission responded to a concern that relaxed pre-screening review would invite a blizzard of meritless applications by persons who did not want to operate a cellular service, but only to win the lottery and sell the license:

> The public notice accepting applications for filing will be carefully qualified to *inform* applicants that strict scrutiny to ensure full compliance with the Commission's application requirements will follow in the event the application is selected in the lottery. In other words, the tentative selectee's application will be carefully reviewed to ensure its compliance with the cellular application standards and will be dismissed for failure to so [sic].

*Id.* at 410 (emphasis added, footnote omitted).

Basically, the Commission's answer was that it would forestall the blizzard of applications by *informing* potential applicants that their applications would receive careful scrutiny at a later time. The Commission pursued the point in a footnote, affirming that applicants "will continue to face the same rigorous scrutiny ...,, albeit at a later stage of application processing." *Id.* at 411 n. 18. The word "continue" suggests that the Commission intended no substantive change in its Phase 2 standards.

---

**2.** One might give § 309(i) a literal reading requiring the FCC to make the determination *before the lottery,* but Singleton does not object to

the Commission's policy decision to reduce the Phase 1 screening to the rather formalistic one it has chosen.

Thus we have no basis for inferring that the FCC had any intent to create either a special procedural duty of carefully articulating its reasons for Phase 2 approval at that stage or any new substantive standard for that approval. Accordingly, though Singleton is quite correct in viewing the *Bureau Decision* as highly conclusory,[3] that was not in itself a breach of any Commission standard.

Singleton might have claimed that the Bureau's decision failed to show adequate reasoning, cf. *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C.Cir. 1970), a claim that we would presumably evaluate by reference to the most authoritative statement of the Commission, i.e., its rejection of the petition to review the Bureau's decision, not the Bureau's own statement. But he makes no such claim.

As a final aspect of his argument that there was no timely Phase 2 approval of Cagal's application, Singleton argues that the Commission's final decision (which he acknowledges to be a finding of acceptability for filing) could not save the Bureau's decision, for it issued not only after the grant of the license but three and a half years after. By this time Cagal had constructed the system and put it into operation, thereby "creat[ing] an environment in which it was difficult [for the Commission] to be impartial". Appellant's Br. at 32. But as we have rejected Singleton's claim that the Bureau decision did not satisfy § 309(i) and the Commission's own procedural standards, this attack is moot.

\*　　\*　　\*　　\*　　\*　　\*

■ Singleton argues that the Bureau and the FCC improperly found Cagal's application acceptable for filing at Phase 2. Here the source of the standard is 47 CFR § 22.20(a), which says in essence that an application will be found unacceptable for filing if it is incomplete ("defective with respect to completeness") or "does not comply" with the FCC's regulations or other requirements. The FCC affirmed the

Bureau's conclusion that Cagal's application met this standard, despite a number of errors, on the ground that "the information contained in the application [was] generally complete, and the defects at issue did not hinder the processing of the application." *Commission Decision*, 6 FCC Rcd at 286 (quoting *Timothy Roper*, 4 FCC Rcd 4070, 4071 (1989)).

Although Singleton uses the Commission's "strict scrutiny" reference to claim some standard of perfection, we have seen that the Commission merely alluded to its intention to continue its former scrutiny. Apart from § 22.20(a), we find that standard in the Commission's prior Phase 2 decisions. In these the Commission has often accepted an application that seemed to violate the rules so long as the errors were minor and easily corrected and therefore did not much "hinder the processing". *Timothy Roper*, 4 FCC Rcd 4070, 4071 (1989). In *Roper*, for example, although a required sketch omitted the height of an antenna tip, the Commission could discern its height; the application showed the height of the support structure and the antenna was to be sidemounted. See also *Macon Group*, 2 FCC Rcd 5409 (1987) (transposed information correctly stated elsewhere); *Lynn Juanes*, 2 FCC Rcd 4371, 4375 (1987) (errors and omissions in technical information were "inconsequential").

The FCC rejects only those applications whose errors are so serious that it is impossible to tell what's going on. Generally, the maps are illegible or seem to depict 39 dBu contours or CGSA boundaries that violate the rules, and the FCC cannot derive a legible and viable map by looking at information contained elsewhere in the application—because this information is either missing or inconsistent. See *Queen City Cellular Communications*, 5 FCC Rcd 509, 510 (1990) (map of wrong scale and so illegible that it was "impossible to deter-

---

**3.** For example, in response to Singleton's argument that Cagal's recalculation of its coordinates constituted impermissible "major" amendments, the Bureau says, "we find [the changes] to be in the nature of minor amend-

ments [citing 47 CFR §§ 22.23, 22.918]." *Bureau Decision*, 2 FCC Rcd at 4271. This response is hardly illuminating; the Bureau meets Singleton's assertion that the errors were major with its assertion that the errors were minor.

mine any latitude, longitude or proper scale markings"); *REM Communication*, 3 FCC Rcd 3705 (1988) (similar); *Round IV Cellular Applications (Defective Maps)*, 103 FCC 2d 366 (1986) (map of wrong scale or lacking depiction of longitude and latitude).

Singleton argues that the errors in Cagal's application, unlike those in ones the Commission has found acceptable, could not be corrected by looking at information elsewhere in the application. Cagal provided incorrect coordinates and elevations for all four of the sites. In an exhibit derived from the coordinates and elevations that Cagal provided, Singleton showed the Commission that the resulting 39 dBu contours not only were different from those asserted by Cagal but covered only 73% of the CGSA.

The FCC's answer is that its engineers could correct the coordinates and verify coverage because the application provided street addresses for the cell sites (three of them in the formal application, and all of them in "site letters" from the owners or lessors). It viewed Cagal's Phase 3 amendment as minor and aimed merely at conforming the application to the original intent.[4] While the Commission does not explain why it chose street addresses over coordinates, a possible answer is that the site letters came from persons who also provided Cagal authority to use the sites and were thus more likely to be free of error. In any event, Singleton did not focus on this question before the Commission (preferring to disregard the street address information), so we cannot fault the Commission for failing to give an answer. Cf. *City of Vernon v. FERC*, 845 F.2d 1042, 1047 (D.C.Cir.1988) (agency "cannot be asked to make silk purse responses to sow's ear arguments").

■ We cannot fault the Commission for locating Cagal's application on the acceptable side of the line. The assessment of such defects is a practical and technical matter, turning in part on how difficult it is for the Commission to fill the gap created by the applicant. Singleton has not shown

us that the Commission in its prior cases has treated similar flaws more strictly; accordingly we defer to its conclusion. See *MCI Cellular Telephone Company v. FCC*, 738 F.2d 1322, 1333 (D.C.Cir.1984) (highly technical questions call for judicial deference).

Singleton also argues that Cagal's application should have been dismissed because its certification—that the "application was complete in every respect and contains all the information required by ... the Commission's cellular application rules", see 47 CFR § 22.913(b)(3)—was false. However, as we affirm the FCC's determination that the application satisfied 47 CFR § 22.20(a), i.e., was complete and complied with the rules, we must reject the argument that the certification was false.

\*     \*     \*     \*     \*     \*

■ Singleton's final argument is that the Bureau should have granted his request for a hearing at Phase 3. The FCC must conduct a hearing if "substantial and material questions of fact exist concerning [the applicant's] qualifications." 47 U.S.C. § 309(i)(2). See *Astroline Communications Co. v. FCC*, 857 F.2d 1556, 1557 (D.C.Cir.1988); *Citizens for Jazz on WRVR, Inc. v. FCC*, 775 F.2d 392 (D.C.Cir. 1985) (discussing three-step test for determining if a hearing is required). However, little disagreement exists as to the facts of this case. The sides, for the most part, agree as to the nature of the errors in Cagal's application; they differ only about the legal implication of these errors. A hearing would have been pointless and the Commission did not err in refusing to hold one.

\*     \*     \*     \*     \*     \*

Finding no error, we affirm.

*So Ordered.*

---

4. The points shown by the coordinates deviated from the ultimate and correct coordinates by distances ranging from 300 feet to 0.45 mile in a CGSA of 1144 square miles.