Notice: This opinion is subject to formal revision before publication in the
Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify
the Clerk of any formal errors in order that corrections may be made
before the bound volumes go to press.

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 16, 2003      Decided February 11, 2003

No. 01-1462

GOLDEN SPREAD ELECTRIC COOPERATIVE, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

SOUTHWESTERN PUBLIC SERVICE COMPANY,
INTERVENOR

———

PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

———

*Robert A. O'Neil* argued the cause for petitioner. With
him on the briefs were *Mary A. Hekman* and *Craig W.
Silverstein*.

*Judith A. Albert*, Attorney, Federal Energy Regulatory
Commission, argued the cause for respondent. With her on

———

Bills of costs must be filed within 14 days after entry of judgment.
The court looks with disfavor upon motions to file bills of costs out
of time.

the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor.

*William M. Dudley* argued the cause for intervenor. With him on the brief was *Floyd L. Norton IV*.

Before: EDWARDS and SENTELLE, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: In 1999 the Federal Energy Regulatory Commission approved a tariff that allowed Southwestern Public Service Company ("SPS") to make sales to affiliates at whatever price the market would bear. Golden Spread objected, claiming that this extension of SPS's authority posed new problems, ones not addressed by the Commission in prior decisions that allowed SPS to sell at market rates—but not to sell to its affiliates *at all*. Finding that FERC did not adequately explain its reasons for rejecting Golden Spread's protest, we remand the case to the agency.

\* \* \*

In 1995 SPS filed a tariff under § 205 of the Federal Power Act, 16 U.S.C. § 824d, under which SPS could sell power at market rates, *Southwestern Public Service Company*, 72 FERC ¶ 61,208 (1995) (the "1995 Order"), but could not sell to its affiliates, *id*. at 61,968. Finding that the market was sufficiently competitive to justify the introduction of market-based rates, *id*. at 61,966, FERC approved the tariff. But its approval included a condition that SPS provide a market analysis every three years, so that the Commission could assess whether "then-current competitive conditions continue to reflect [SPS's] lack of market power in short-term markets." *Id*. at 61,967.

SPS then became the subject of a rather complex transaction, as a result of which a holding company called New Century Energies, Inc. became the owner of SPS and Public Service Company of Colorado. The latter has a power marketing affiliate with the allusive moniker "e prime"; like SPS,

e prime was authorized to sell at market rates. See *Public Service Company of Colorado and e prime*, 74 FERC ¶ 61,351 (1996). (On consummation of the merger, of course, it became an affiliate of SPS and subject to the restriction on SPS's selling authority.) Another affiliate is New Century Services, which acts as New Century's "service subsidiary"; for simplicity's sake we call both it and the parent New Century.[1]

On SPS's filing of its triennial update on September 1, 1998, Golden Spread intervened, asking FERC to rescind the earlier grant of authority to sell at market prices. The parties settled the dispute with an agreement they now call the Global Settlement, in which Golden Spread agreed to drop its protest "without prejudice" but secured in exchange a set of contracts designed to protect it against unfavorable market conditions. With the parties in agreement, FERC approved the settlement, and the market-based rate authority remained in place. *Southwestern Public Service Co.*, 86 FERC ¶ 61,050, clarified, 86 FERC ¶ 61,260 (1999).

Seven days after the approval of the Global Settlement, New Century filed the tariff application at issue here, which among other things would allow sales by SPS to affiliates (including e prime); as with SPS's non-affiliate transactions, the rates would be limited only by the market. Golden Spread once again filed a protest, claiming that the new tariff could result in rates that were not just and reasonable. It asked FERC either to reject the new tariff or at least to add conditions to prevent SPS from manipulating transactions with its affiliates in such a way as to in fact exert market power. FERC rejected Golden Spread's proposals and approved the tariff, *New Century Services, Inc.*, 86 FERC ¶ 61,307 (1999) (the "Initial Order"), later denying Golden Spread's request for rehearing, *New Century Services, Inc.*, 96 FERC ¶ 61,223 (2001) (the "Rehearing Order").

---

[1] After the Commission's orders here, the parent New Century merged with Northern States Power Company, forming a new corporation known as Xcel Energy Inc. See *Northern States Power Co.*, 90 FERC ¶ 61,020 (2000).

4

* * *

In its papers before the Commission Golden Spread expressed its primary concern rather obscurely. Although we said in *City of Vernon v. FERC*, 845 F.2d 1042, 1047 (D.C. Cir. 1988), that the Commission "cannot be asked to make silk purse responses to sow's ear arguments," we also implicitly held that a sow's ear argument deserves at least a sow's ear answer; we found the claim there expressed just clearly enough to have required a real substantive response. Golden Spread's claims, sow's ear though they may be, didn't get such a response here.

At the core of its arguments was the idea that under the new tariff SPS would be able to "park" all of its excess capacity with affiliates such as e prime, which could then turn around and sell that capacity at market rates. In times of shortage for Golden Spread, occasioned by a failure or any temporary cessation at one of its own generation plants, the affiliate would be able to exert market power, extracting supra-competitive prices from Golden Spread.

At the outset this claim poses the question how the orders' grant to SPS of authority to sell to its affiliates actually increased Golden Spread's risks. If e prime can now sell power at astronomical rates, why could not SPS have done so before the orders? But Golden Spread makes a case that the incremental authority plays a critical role. As part of the Global Settlement, Golden Spread and SPS signed a Replacement Energy Agreement ("REA") that allowed either company, in the event of failure of its own generation facilities, to purchase excess energy from the other, at cost-based rates. The agreement protected Golden Spread from the risk of having to buy emergency power from SPS at supra-competitive rates. But Golden Spread argues that the REA offers it no protection in a situation where SPS has committed its otherwise excess energy to an affiliate. With the new authority, it says, SPS can strip itself of "excess" energy, while at the same time leaving its affiliate free to insist on excessive prices from Golden Spread. Neither the Commis-

sion nor SPS (as intervenor) seems to question this porous interpretation of the REA.

Of course SPS's possible frustration of the REA would still pose no great risk to Golden Spread if there were enough alternative sources of supply with access to the relevant market. Golden Spread acknowledges that FERC explicitly determined in the 1995 Order that SPS did not control even 25 percent of either installed or uncommitted capacity in any of the markets considered. To this Golden Spread responds that the figures rely on market definitions that are unrealistic in light of current constraints on power transmission. Whereas the Commission analyzed SPS's share of various broadly defined markets, Golden Spread fears that transmission congestion would prevent it from securing supplies for its customers in the Texas panhandle. It points to a publication of the Public Utility Commission of Texas, *Report to The Texas Senate Interim Committee on Electric Utility Restructuring* (July 1998), finding that SPS was the source of 80 per cent of the power generated in the panhandle, and that transmission facilities were capable of importing only 10 per cent of the region's generating capacity. *Id.* at 19–21.

The Commission has not directly disputed these claims of constrained transmission capacity. In the Rehearing Order, to be sure, it said that there was "no foundation to Golden Spread's complaint that we failed to evaluate potential transmission constraints" in the Initial Order, see Rehearing Order, 96 FERC at 61,916, but in fact that assertion rested solely on the Initial Order's finding of *non-discrimination*, see *id.*; see also Initial Order, 86 FERC at 62,066 (saying the applicable open access tariffs assured that "customers are treated on a non-discriminatory basis"). But Golden Spread's theory doesn't depend on discrimination. It depicts SPS selling (otherwise excess) power at supra-competitive prices to e prime, which in turn could pass those prices on to Golden Spread. Golden Spread's access to non-discriminatory transmission would assure its ability to import such over-priced power, but wouldn't supply it with power priced at cost—the benefit it thought it had secured under the REA.

In this context there is little purchase to the Commission's point that it had subjected the present tariff to the conditions on affiliate transactions laid out in *Detroit Edison Co.*, 80 FERC ¶ 61,348 at 62,197 (1997). Those conditions require (1) that the rates for sales to affiliates be no lower than the rate charged to non-affiliates; (2) that offers to sell power to the affiliate be simultaneously offered to non-affiliated customers through an electronic bulletin board; and (3) that the actual price charged to all affiliates be posted on the board. *Id.* These conditions are plainly aimed at protecting retail competitors from *under*pricing in affiliate sales; they do nothing to protect Golden Spread from the danger it espies in SPS's ability to shift its otherwise uncommitted energy to e prime at supra-competitive prices. One can imagine circumstances and interpretations of the REA in which SPS's duty of non-discriminatory transmission or the *Detroit Edison* conditions could wholly or partially thwart this scenario,[2] but a mere partial solution would not justify the Commission's brush-off of Golden Spread's claim; more importantly, the Commission has not even attempted any such interpretation of the controlling instruments.

Finally, in its briefs and at oral argument, FERC parried Golden Spread's contentions by pointing to the affiliate codes of conduct imposed on SPS and its affiliates. See, e.g., *Open Access Same–Time Information System (Formerly Real–Time Information Networks) and Standards of Conduct*, 61 Fed. Reg. 21,737 at 21,743–45 (1996). But the Commission did not advance this argument or make any findings to that effect in either of the orders. Its "action must be measured by what [it] did, not by what it might have done." *SEC v. Chenery Corp.*, 318 U.S. 80, 93–94 (1943). Similarly, the Commission's observation in its brief that its 1995 examination of the transmission market had shown no "significant" transmission constraints, see *Southwestern*, 72 FERC at

---

[2] Suppose, for example, that Golden Spread's demand for equal treatment with e prime forced a reduction in the latter's take of SPS power, which under the REA was interpreted as rendering some of that power "excess" and consequently available to Golden Spread.

61,967, refers to a finding that was four years old at the time of the Initial Order and that at no time addressed the precise region identified by Golden Spread.

In short, we find that the Commission has not answered Golden Spread's contentions that authority for SPS to sell to affiliates will frustrate Golden Spread's contractual protection against possible SPS market power. Answers may exist in abundance, but it is up to the Commission to provide them. The Commission's orders are

*Remanded.*